1

**SHAWN K. AIKEN**
**2390 East Camelback Road**
**Suite 400**
2
**Phoenix, Arizona 85016**
**Telephone: (602) 248-8203**
3
docket@ashrlaw.com
ska@ashrlaw.com
4
ham@ashrlaw.com
whk@ashrlaw.com
5
sml@ashrlaw.com
**Shawn K. Aiken - 009002**
6
**Heather A. Macre - 026625**
**William H. Knight - 030514**
7
**Stephanie McCoy Loquvam**
**- 029045**
8

**HERB ELY**
**3200 North Central Avenue**
**Suite 1930**
**Phoenix, Arizona 85012**
**Telephone: 602-230-2144**
HerbEly@eburlaw.com
 Herb Ely – 000988

**MIKKEL (MIK) JORDAHL P.C.**
**114 North San Francisco**
**Suite 206**
**Flagstaff, Arizona 86001**
**Telephone: (928) 214-0942**
mikkeljordahl@yahoo.com
**Mikkel Steen Jordahl - 012211**

9

**DILLON LAW OFFICE**
**PO Box 97517**
10
**Phoenix, Arizona 85060**
**Telephone: (480) 390-7974**
11
dillonlaw97517@gmail.com
**Mark Dillon - 014393**
12

**GRIFFEN & STEVENS**
**LAW FIRM, PLLC**
**609 North Humphreys St.**
**Flagstaff, Arizona 86001**
**Telephone: (928) 226-0165**
stevens@flagstaff-lawyer.com
**Ryan J. Stevens - 026378**

13

*Attorneys for Plaintiffs*

14

15

## UNITED STATES DISTRICT COURT

16

## DISTRICT OF ARIZONA

17

| | |
|---|---|
| Joseph Connolly and Terrel L. Pochert; Suzanne Cummins and Holly N. Mitchell; Clark Rowley and David Chaney; R. Mason Hite, IV and Christopher L. Devine; Meagan and Natalie Metz; Renee Kaminski and Robin Reece; Jeffrey Ferst and Peter Bramley, | Case No. 2:14-cv-00024-JWS |
| | **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | **MEMORANDUM OF LAW** |
| v. | |
| Chad Roche, In His Official Capacity As Clerk Of The Superior Court Of Pinal County, Arizona; Michael K. Jeanes, In His Official Capacity As Clerk Of The Superior Court Of Maricopa County, Arizona; and Deborah Young, In Her Official Capacity As Clerk Of The Superior Court Of Coconino County, Arizona, | |
| Defendants. | |

18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

MEMORANDUM OF LAW ................................................................................................. 2

I.   BAKER V. NELSON DOES NOT BAR PLAINTIFFS' CLAIMS. ................................... 2

II.  THE MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL PROTECTION
     CLAUSE OF THE U.S. CONSTITUTION. .................................................................3

     A.   The Marriage Discrimination Laws Fail Review Under Heightened
          Scrutiny. ......................................................................................... 4

          1.   The Marriage Discrimination Laws serve no important
               governmental objectives....................................................5

          2.   The Marriage Discrimination Laws were actually motivated
               by fear and prejudice. .......................................................7

          3.   No substantial relationship exists between the Marriage
               Discrimination Laws and any important state interest. ................. 8

     B.   The Marriage Discrimination Laws Fail Review Under Rational Basis. ..10

          1.   Tradition, history and morality are not legitimate state
               purposes......................................................................... 11

          2.   Concerns about same-sex parenting are neither legitimate nor
               rationally related to legitimate purposes.......................................12

     C.   The Marriage Discrimination Laws Impermissibly Discriminate on
          the Basis of Sex. ..............................................................................12

III. THE MARRIAGE DISCRIMINATION LAWS VIOLATE THE DUE PROCESS
     CLAUSE OF THE U.S. CONSTITUTION ................................................................14

     A.   The Marriage Discrimination Laws Affect Fundamental Rights. ............14

          1.   The right to marry is a fundamental right for all. ..........................14

          2.   Family association is a fundamental right infringed by the
               Marriage Discrimination Laws.......................................................16

     B.   Laws Infringing On the Fundamental Right to MarryFail Strict
          Scrutiny. ........................................................................................17

     C.   The Fundamental Right to Marry Cannot Be Infringed Based On
          History and Tradition. ......................................................................18

     D.   The Fundamental Right to Marry is Not Limited to Couples Who Can
          Procreate............................................................................................19

E.   The Fundamental Right to Marry Cannot be Denied to Same-Sex Couples Even Though the Regulation of Marriage is Generally Left to the States. ............................................................................. 20

IV.   THE COURT SHOULD PERMANENTLY ENJOIN ENFORCEMENT OF THE MARRIAGE DISCRIMINATION LAWS TO PROHIBIT FURTHER CONSTITUTIONAL HARM.  ....................................................................................... 22

CONCLUSION AND REQUEST FOR RELIEF ....................................................23

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*

# INTRODUCTION

Marriage is the "most important relation in life." *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978) (internal quotations omitted). The right to marry, "central to personal dignity and autonomy," *Lawrence v. Texas*, 539 U.S. 558, 574 (2003) (internal quotations omitted), "has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men." *Loving v. Virginia*, 388 U.S. 1, 12 (1967). The Fourteenth Amendment therefore shelters our marital choices "against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996).

For over thirty years, however, Arizona's laws and Constitution have prohibited gay and lesbian Arizonans from choosing their marital partner. In 1980, and again in 1996, the Arizona legislature outlawed same-sex marriages. *See* A.R.S. §§ 25-125(A) ("A valid marriage is contracted by a male person and a female person[.]") and 25-101(C)("Marriage between persons of the same sex is void and prohibited."). In 2008, voters approved an amendment to the Arizona Constitution barring even recognition of same-sex marriages. *See* ARIZ. CONST. art. 30, § 1 ("Only a union of one man and one woman shall be valid or recognized as a marriage in this state.")("Marriage Discrimination Laws").

At the close of its last term, the Supreme Court struck Section 3 of the federal Defense of Marriage Act (DOMA), which barred any federal marital benefits to same-sex couples who were legally married in states that permitted such marriages. *See U.S. v. Windsor*, 133 S.Ct. 2675 (2013). Following the path set out in *Windsor*, Plaintiffs—seven same-sex couples who wish to marry or gain the State of Arizona's recognition of their marriages elsewhere—request this Court's declaration that Arizona may no longer deny them the 'vital personal right' to choose their marital partner. The Court should strike the Marriage Discrimination Laws under the Equal Protection and Due Process Clauses of the Fourteenth Amendment, Plaintiffs argue, and the Court should permanently enjoin enforcement of those laws.

–1–

**MEMORANDUM OF LAW**

## I.    BAKER V. NELSON DOES NOT BAR PLAINTIFFS' CLAIMS.

Defendants raised *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *appeal dismissed*, 409 U.S. 810 (1972), as a bar to this action. *See* (Def.'s Am. Answer at 8, Mar. 17, 2014 ECF No. 20). In *Baker*, the Minnesota Supreme Court upheld the county clerk's refusal to issue a marriage license to a same-sex couple. *See id.* at 187 (Minnesota statute did "not offend the First, Eighth, Ninth, or Fourteenth Amendments to the United States Constitution."). The appellant exercised what was then a mandatory right of appeal to the Supreme Court, *see* former 28 U.S.C. § 1257(2) (1982) (repealed in 1988), but the Supreme Court summarily dismissed for want of a substantial federal question. *Baker*, 409 U.S. at 810.

The Supreme Court's summary dismissals bind lower courts only to the extent that later "doctrinal developments" evident in Supreme Court decisions do not undermine the dismissal. *Hicks v. Miranda*, 422 U.S. 332, 344 (1975) (internal quotations omitted). Here, *Baker* does not control because intervening decisions from the Supreme Court itself—*Romer v. Evans*, 517 U.S. 620 (1996), *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Windsor*, 133 S.Ct. 2675 (2013)—confirm that the issue of same-sex marriage—once an "unsubstantial" question in 1972—is now a "substantial" question. During the last five months, all eleven federal district courts that have faced this question followed the reasoning in *U.S. v. Windsor* and struck state laws and constitutional provisions banning same-sex marriage or recognition of same-sex marriages.[1] In the words

---

[1] *See Henry v. Himes*, —F. Supp. 2d—, No. 1:14–cv–129, 2014 WL 1418395, at *1, *18 (S.D. Ohio Apr. 14, 2014) (permanently enjoining enforcement of Ohio anti-recognition provisions on due process and equal protection grounds); *Baskin v. Bogan*, —F. Supp. 2d—, No. 1:14-cv-00355 (S.D. Ind. April 10, 2014) (J. Young) (temporarily enjoining Indiana's marriage recognition ban); *DeBoer v. Snyder*, —F. Supp. 2d—, No. 12–CV–10285, 2014 WL 1100794, at *17 (E.D. Mich. Mar. 21, 2014) (permanently enjoining Michigan anti-celebration provisions on equal protection grounds); *Tanco v. Haslam*, —F. Supp. 2d—, No. 3:13–cv–01159, 2014 WL 997525, at *6, *9 (M.D. Tenn. Mar. 14, 2014) (enjoining enforcement of Tennessee anti-recognition provisions on equal protection grounds); *De Leon v. Perry*, —F. Supp. 2d—, No. SA-13-CA-00982, 2014 WL 715741, at *1, *24 (W.D. Tex. Feb. 26, 2014) (preliminarily enjoining Texas anti-celebration and anti-recognition provisions on equal protection and due process grounds); *Lee v. Orr*, —

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*

1  of U.S. District Judge Arenda Wright Allen, "doctrinal developments since 1971 compel
2  the conclusion that *Baker* is no longer binding." *Bostic*, 2:13-cv-395, 2014 WL 561978, at
3  *9 (holding that Virginia's laws barring same sex-marriage are unconstitutional). The
4  Court should turn to the merits.

5
6  ## II.   THE MARRIAGE DISCRIMINATION LAWS VIOLATE THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION.

7  The Fourteenth Amendment to the U.S. Constitution provides that no state shall
8  "deny to any person within its jurisdiction the equal protection of the laws[,]" U.S.
9  CONST., amend. XIV, § 1, and requires that all persons similarly situated should receive
10  equal treatment, *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439
11  (1985), even where the reviewing court must strike a state constitutional provision or
12  state statute. *See, e.g.*, *Romer*, 517 U.S. 620 (invalidating state constitutional amendment);
13  *Zablocki*, 434 U.S. 374 (invalidating state statute).

14  Plaintiffs challenge the Marriage Discrimination Laws, which, Plaintiffs contend,
15  violate the Equal Protection Clause of the Fourteenth Amendment for three reasons:

16  (1) denial of equal access to marriage—a fundamental right—requires review
17  under the heightened scrutiny standard, which the Marriage Discrimination Laws fail
18  because they serve no important government purpose, their means are not substantially
19  related to conceivable purposes, and the Arizona Legislature was actually motivated by

20

21  F. Supp. 2d—, No. 13–cv–8719, 2014 WL 683680 (N.D. Ill. Feb. 21, 2014) (declaring
22  Illinois' celebration ban unconstitutional on equal protection grounds); *Bostic v. Rainey*,
   —F. Supp. 2d—, No. 2:13–cv–395, 2014 WL 561978, at *23 (E.D. Va. Feb. 13, 2014)
23  (finding Virginia's anti-celebration and anti-recognition laws unconstitutional on due
   process and equal protection grounds, and preliminarily enjoining enforcement); *Bourke*
24  *v. Beshear*, —F. Supp. 2d—, No. 3:13–cv–750, 2014 WL 556729, at *1 (W.D. Ky. Feb. 12,
   2014) (declaring Kentucky's anti-recognition provisions unconstitutional on equal
25  protection grounds); *Bishop v. United States ex rel. Holder*, 962 F.Supp. 2d 1252, 1295–96
   (N.D. Okla. Jan. 14, 2014) (permanently enjoining Oklahoma's anti-celebration provisions
26  on equal protection grounds); *Obergefell v. Wymyslo*, 962 F.Supp.2d 968, 997–98 (S.D.
   Ohio Dec. 23, 2013) (permanently enjoining plaintiffs' enforcement of Ohio's anti-
27  recognition provisions on due process and equal protection grounds); *Kitchen v. Herbert*,
   961 F.Supp. 2d 1181, 1216 (D. Utah 2013) (permanently enjoining Utah's anti-celebration
28  provisions on due process and equal protection grounds).

–3–

prejudice (PSOF ¶¶ 34–46);

(2) the Marriage Discrimination Laws fail even rational basis review because the tradition, speculation, and "optimal child-rearing" theories are not legitimate government interests, (PSOF ¶¶ 57–62); and,

(3) the Marriage Discrimination Laws discriminate impermissibly on the basis of sex.

## A.   The Marriage Discrimination Laws Fail Review Under Heightened Scrutiny.

The Marriage Discrimination Laws ban only gay and lesbian couples from marrying within Arizona and void only their otherwise legal marriages solemnized in other states. A.R.S. §§ 25-112(A) and -101(C). In the Ninth Circuit, when gays and lesbians receive disparate treatment from the government, the heightened scrutiny standard of review controls. "There can no longer be any question that gays and lesbians are no longer a 'group or class of individuals normally subject to "rational basis" review.'" *SmithKline Beecham Corp. v. Abbott Laboratories*, 740 F.3d 471, 484 (9th Cir. 2014) (quoting *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 143 (1994)) (requiring heightened scrutiny review of equal protection challenges to sexual orientation classifications in the Ninth Circuit); *cf. Witt v. Dep't of Air Force,* 527 F.3d 806 (9th Cir. 2008) (requiring heightened scrutiny in Due Process challenges to sexual orientation classifications in the Ninth Circuit).[2]

---

[2]   Plaintiffs cite *SmithKline* throughout this brief. In reaching its decision that discrimination based on sexual orientation warrants heightened scrutiny, the *SmithKline* panel relied heavily on the fact that the analysis performed by the Supreme Court in *Windsor* far exceeded the scope of "rational basis" review. The panel also relied on the Ninth Circuit's parallel holding in *Witt*, 527 F.3d at 821–22 (applying heightened scrutiny to a due process analysis of sexual orientation classifications; and, interpreting *Lawrence v. Texas* to hold that the Supreme Court had exceeded the scope of "rational basis" review).

The Ninth Circuit recently issued a *sua sponte* order calling for briefing on whether it should review the *SmithKline* decision *en banc. SmithKline Corp v. Abbott Labs.,* Civil A. No. 11-17357, Order dated March 27, 2014. If a majority of the Ninth Circuit's active judges vote for *en banc* review, *SmithKline* cannot be cited as precedent in the Ninth Circuit pending final review. Ninth Cir. Gen. Order 5.5(d) (November 2011). That vote should occur before briefing of this motion concludes.

First, the Marriage Discrimination Laws fail the heightened scrutiny standard of review because the plain text of the provisions reveal no important government interest, but explicitly state that *discrimination itself* was the purpose. (PSOF ¶¶ 13–33). Second, the record reveals that the Arizona Legislature was motivated by fear and prejudice in adopting the offending statutes. (PSOF ¶¶ 13–46). Third, even if the offered justifications constituted some important government interest, the Marriage Discrimination Laws bear no substantial relationship to achieving those interests and in fact their enforcement often *hinders* achievement of the proffered justifications. (PSOF ¶ 62, Ex. 52 at 1373–74) ("Public health research has suggested not only that discriminatory environments and bans on same-sex marriage are detrimental to health but also that legalizing same-sex marriage . . . contributes to better health for LGBT people.").

### 1. The Marriage Discrimination Laws serve no important governmental objectives.

In order to withstand review under the heightened scrutiny standard, Defendants must show at least "that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *United States v. Virginia*, 518 U.S. 515, 533 (1996) (applying heightened scrutiny to gender classifications). The burden of justification is "demanding" and rests entirely on Defendants. *Id*. Moreover, the justification must be "exceedingly persuasive" and must be genuine, not hypothesized or invented *post hoc* in response to litigation. *Id*.

---

Regardless of the precedential status of *SmithKline* following the Circuit vote, the authority from which *SmithKline* derived its standard of scrutiny—*Windsor*, *Lawrence* and *Witt*—remain good law. Should the Circuit undertake *en banc* review of *SmithKline* during the pendency of this motion, Plaintiffs therefore respectfully request that the Court disregard Plaintiffs' citations to *SmithKline* as precedent in this brief, and look instead to the similar, implicit reasoning in *Windsor* and *Lawrence*, and to the parallel, explicit reasoning in *Witt*, to reach the same conclusion that the *SmithKline* panel reached—heightened scrutiny, rather than rational basis, is the applicable standard of review.

Arizona's Marriage Discrimination Laws appeared in three waves between 1980 and 2008. The Laws were amended twice in ways relevant to this litigation, in 1980 and 1996, and a state constitutional amendment was added in 2008. (PSOF ¶¶ 13–33). In 1980, the definition of marriage changed from "two persons" to "a male and female." (PSOF ¶ 15). Neither the text of that statutory change nor its legislative history reflects any legislative purpose for the amendment. According to the limited legislative history available, the language appears to have been a last-minute insertion into a bill that was directed at more general issues relating to marriage licenses and underage marriages. (PSOF ¶¶ 14–15).

During the second relevant legislative session, in 1996, the legislature acted to ban same sex-marriage and the recognition of valid same-sex marriages from other jurisdictions. The legislation—Senate Bill ("S.B.") 1038 (later codified as A.R.S. §§ 25-112(A) and -101(C), two of the Marriage Discrimination Laws) (PSOF ¶¶ 17–26)—stemmed from concerns over a Hawaii case in which the court seemed poised to legalize same-sex marriage in that state. (PSOF ¶¶ 16–17, 41).

The officially-stated purpose of amended S.B. 1038 was as follows: "Clarifies that same sex marriages are prohibited. Provides that all marriages prohibited by Arizona statute that are solemnized in another state or country are not valid in Arizona." (PSOF ¶ 20). According to the Senate Fact Sheet and the written and audio record of the House Judiciary Committee and Committee of the Whole discussions, legislators proposed the legislation out of concern that Arizona might be obliged under the Full Faith and Credit Clause to recognize same-sex marriages solemnized in Hawaii. (PSOF ¶¶ 16–17; 41).

Finally, in 2008, the Arizona legislature referred an amendment to the Arizona Constitution that would prevent same-sex couples from marriage. (PSOF ¶ 30). Proposition 102, the "Marriage Protection Amendment," provided: "Only a union of one man and one woman shall be valid or recognized as a marriage in this state." (PSOF ¶ 31). After Arizona voters approved Proposition 102 on November 4, 2008 (PSOF ¶ 32), the State's constitution prohibited same-sex couples from marrying within Arizona and

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*

denied recognition of lawful marriages that same-sex couples celebrated in other jurisdictions. ARIZ. CONST., art. 30, § 1. (PSOF ¶ 33).

As both the clear text and legislative history confirm, proponents of the Marriage Discrimination Laws sought to prevent homosexuals from marrying or, if they married elsewhere, enjoying the benefits of marriage in Arizona. The Laws fail heightened scrutiny for this reason alone—a discriminatory purpose cannot constitute an "exceedingly persuasive" justification. *See Lawrence*, 539 U. S. at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice."); *Perry*, 671 F.3d at 1093 (basic disapproval of a group of people cannot constitute a legitimate government interest) (citing *Romer*, 517 U.S. at 633–35); *Kitchen*, 961 F.Supp.2d at 1213–14, *appeal pending*, Case No. 13-4178 (10th Cir.) (tradition merely a kinder way of describing moral disapproval); *Bishop*, , 962 F. Supp. 2d at 1289, *appeal pending*, Case Nos. 14-5003 and 14-5006 (10th Cir.) ("[M]oral disapproval of homosexuals as a class, or same sex marriage as a practice, is not a permissible justification for a law.").

### 2. The Marriage Discrimination Laws were actually motivated by fear and prejudice.

The Marriage Discrimination Laws also fail review under the second prong of heightened scrutiny review—assessment of the Legislature's actual motivation. *Virginia*, 518 U.S. at 533; *SmithKline*, 740 F.3d at 482–83. At this stage, courts consider only what actually motivated a legislature and ignore theoretical explanations. *SmithKline*, 740 F.3d at 481–82.[3]

---

[3] The Supreme Court found it necessary to clarify that, in rational basis review, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Fed. Commc'n Comm'n v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). It follows that heightened scrutiny, on the other hand, *requires* a look at what actually motivated the legislature, which the *SmithKline* panel explicitly stated. *SmithKline*, 740 F.3d at 482 ("*Windsor* thus requires not that we conceive of hypothetical purposes, but that we scrutinize Congress's actual purposes.").

The record here reveals that the Marriage Discrimination Laws were motivated by fear and prejudice. (PSOF ¶¶ 16–17, 34–41). The arguments offered in favor of S.B. 1038 reflected moral and religious disapproval of homosexuals and same-sex marriage. (PSOF ¶¶ 34–36, 38–43). Some state legislators equated marriage equality with the downfall of Judeo-Christian values and even Western civilization itself. (PSOF ¶¶ 38–40).

The same day that the House Judiciary Committee and the Committee of the Whole debated the measure, Rep. Tom Smith, then Chairman of the House Judiciary Committee and the primary sponsor of S.B. 1038, was quoted in the press on the subject:

> Can you imagine? Two guys get married, and (the priest) says, "You may kiss the bride," and so he lifts up the veil and says, "Hey, you forgot to shave?"
>
> *I can't think of anything more disgusting.*

(PSOF ¶ 34) (emphasis added).

Vicious stereotypes—such as the "fact pack" from the Center for Arizona Policy ("CAP") stating that "the 'average' male homosexual ha[s] about 1,000 different sex partners in a lifetime"—underpinned the debates. (PSOF ¶¶ 34–43). Proponents spoke of "rebuild[ing] *healthy*, *normal* marriages," and "giv[ing] children a *proper* start in life," betraying their view that homosexuals were abnormal, unhealthy, and unfit to raise children. (PSOF ¶¶ 35–36) (emphases added). One legislator, acknowledging that the laws violated the Equal Protection clause, stated that such laws were "brought by people who wish to eradicate homosexuals and fear homosexuals." (PSOF ¶ 23).

As Justice Kennedy observed last term in *Windsor*, "[t]he Constitution's guarantee of equality 'must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot' justify disparate treatment of that group." *Windsor*, 133 S.Ct. at 2693 (citation omitted).

### 3.   No substantial relationship exists between the Marriage Discrimination Laws and any important state interest.

The final prong of heightened scrutiny requires that the discriminatory means employed by the State must be substantially related to the achievement of its objectives.

*Virginia*, 518 U.S. at 533. When reviewing the actual purposes of a discriminatory law, courts "carefully consider the resulting inequality to ensure that our most fundamental institutions neither send nor reinforce messages of stigma or second-class status." *SmithKline*, 740 F.3d at 483.

In scrutinizing Section 3 of DOMA, the Supreme Court observed that the Act "writes inequality into the entire United States Code." *Windsor*, 133 S.Ct. at 2694. The Marriage Discrimination Laws likewise write inequality into the fabric of Arizona law. Same-sex couples who cannot marry or gain recognition of their marriages are denied the benefits of over 1,150 Arizona laws that currently apply only to different-sex married couples[4] ranging from the seemingly mundane—their children have no priority to inherit the non-adoptive parent's estate without an enforceable will—to uncertainty over what happens when a child's adoptive parent dies because the survivor has no parental rights. (PSOF ¶¶ 1, 50–52, 59–60, 62; *see generally* PSOF, Ex. 15 (Compendium of Laws)).

Plaintiffs confirm these burdens. (PSOF ¶ 1, Exs. 1–14).[5] They cannot, for example, file joint tax returns, inherit their partner's estate should one die intestate, visit one another in the hospital, or be listed as one another's "spouse" on a death certificate. (PSOF ¶¶ 1, 6–9). These laws stigmatize their relationships and their children. (PSOF ¶¶ 1, 59–60, 62). Plaintiffs, like other same-sex couples, are forced to devise costly legal alternatives just to imitate the protections automatically conferred on married different-sex couples, such as medical powers of attorney. (PSOF ¶¶ 1, 6–9). They then must suffer the indignity of carrying their "papers" at all times or risk separation from each other

---

[4] The "fact sheet" attached to S.B. 1038's legislative record confirms that the legislation was intended to deprive same-sex couples of the rights and benefits listed in that "fact sheet" and that are enjoyed by married different-sex couples who live similarly committed and financially intertwined lives, including "the right to inherit, to obtain joint parental custody, to file joint tax returns, to adopt children, to obtain health and insurance spousal benefits, etc." (PSOF ¶ 41).

[5] This same discrimination persists today: the Arizona Legislature recently passed S.B. 1062, which would have sanctioned private discrimination against gays and lesbians. (PSOF ¶ 46).

–9–

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*

during emergencies.[6] The Marriage Discrimination Laws leave Plaintiffs, and many thousands of same-sex couples in Arizona,[7] in a place of uncertainty—quite literally—from the cradle to the grave. Plaintiffs urge application of the heightened scrutiny standard of review and, under that review, the Court's finding that the Marriage Discrimination Laws violate the Equal Protection Clause of the Fourteenth Amendment.

**B.      The Marriage Discrimination Laws Fail Review Under Rational Basis.**

Even if the court does not undertake heightened scrutiny review, the Marriage Discrimination Laws still fail under rational basis, the lowest standard of review. *Cf. Romer,* 517 U.S. at 631–36 (holding that status-based classification of homosexuals, "for its own sake," not a "proper legislative end" sufficient to withstand even rational basis review).

Rational basis review requires that courts determine whether the governmental action bears a rational relationship to a legitimate state interest, *Romer,* 517 U.S. at 631, a standard that is highly deferential to state legislatures. *FCC v. Beach,* 508 U.S. 307, 314 (1993). In other words, the rational basis test refers to a judicial standard of review that examines whether a legislature had a reasonable and not an arbitrary basis for enacting a particular statute. *Gulf, C. & S.F. R. Co. v. Ellis,* 165 U.S. 150, 155 (1897). Unlike heightened scrutiny, Plaintiffs must bear the burden to show that no rational basis for the offending laws exist.

Plaintiffs prevail even under rational basis review because the Marriage Discrimination Laws do not advance even the illegitimate justifications—tradition, history, and morality—typically offered in support of marriage discrimination and because same-sex couples serve as parents just as capably as different-sex couples.

---

[6] *See* (PSOF, Ex. 1, ¶ 22) ("We had to create and pay for legal protections . . . that our opposite-sex counterparts automatically enjoy as a benefit of having a marriage that is recognized by the state. We must carry . . . private and privileged information, which we must share with private institutions simply to establish our relationship in case of an emergency.").

[7] Between 16,000 and 21,000 same-sex families live in Arizona today. (PSOF ¶ 11).

–10–

1   Finally, striking the Marriage Discrimination Laws does not impermissibly intrude on

2   Arizona's traditional authority over domestic relations.

3       **1.**     **Tradition, history and morality are not legitimate state purposes.**

4       Under rational basis review, tradition and history do not serve as legitimate state

5   purposes. *See Heller v. Doe*, 509 U.S. 312, 326 (1993) ("Ancient lineage of a legal concept

6   does not give it immunity from attack for lacking a rational basis."); *see also Perry*, 671

7   F.3d at 1093 (mere disapproval of a group of people cannot constitute a legitimate

8   government interest (*citing Romer,* 517 U.S. at 634)). The eleven federal district courts to

9   decide marriage equality cases since *Windsor* have held that there is no legitimate state

10   interest in tradition, history, or morality sufficient to justify marriage discrimination.[8]

11       Granted, a majority of Arizona voters ratified Article XXX, § 1 of the Arizona

12   Constitution. (PSOF ¶¶ 33–34). Rep. Paul Newman, a Democrat from Southeastern

13   Arizona, spoke out against and then voted for S.B. 1038, because, he said, that is what his

14   constituents wanted. (PSOF ¶¶ 32–33). But, majoritarian conceptions of right and wrong

15   "cannot strip other citizens of the guarantees of equal protection under the law." *DeBoer*,

16   2014 WL 1100794, at *15. As Judge Friedman put it:

17           The same Constitution that protects the free exercise of one's
18           faith in deciding whether to solemnize certain marriages
        rather than others, is the same Constitution that prevents the
19           state from either mandating adherence to an established
        religion, U.S. CONST. AMEND I, or "enforcing private moral
20           or religious beliefs without an accompanying secular
        purpose." *Perry*, 704 F.Supp.2d at 930–931 (citing *Lawrence v.*
21           *Texas*, 539 U.S. 558, 571, 123 S.Ct. 2472, 156 L.Ed.2d 508
        (2003)).

22   *Id.*

23       [8] *See, e.g.,* note 1, *supra*; *Himes*, 2014 WL 1418395, at *1 ("***Ohio's marriage***
24   ***recognition bans are facially unconstitutional and unenforceable under any***
***circumstances.***" (emphasis in original)); *DeBoer*, 2014 WL 1100794, at *15 ("tradition
25   and morality are not rational bases" for marriage bans); *Bostic,* 2014 WL 561978 at *23
("Government interests in perpetuating traditions, shielding state matters from federal
26   interference, and favoring one model of parenting over others must yield to this country's
cherished protections that ensure the exercise of the private choices of the individual
27   citizen regarding love and family"); *Bishop*, 962 F.Supp. 2d at 1289 ("[M]oral disapproval
of homosexuals as a class, or same sex marriage as a practice, is not a permissible
28   justification for a law."); *Kitchen*, 961 F.Supp. 2d at 1213–14 (tradition is just a kinder way
of describing moral disapproval).

**2.   Concerns about same-sex parenting are neither legitimate nor rationally related to legitimate purposes.**

Today, social science and psychological research in scores of cases throughout the United States have confirmed that the quality of parenting, not the gender of the parents, affects childhood development. (PSOF ¶¶ 57–62). "The sexual orientation of an individual does not determine whether that individual can be a good parent. Children raised by gay or lesbian parents are as likely as children raised by heterosexual parents to be healthy, successful and well-adjusted. The research supporting this conclusion is accepted beyond serious debate in the field of developmental psychology." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 980 (N.D. Cal. 2010), *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012), *vacated and remanded sub nom. Hollingsworth v. Perry*, 133 S.Ct. 2652 (2013).

Same-sex families continue to have children with increasing frequency, (PSOF ¶¶ 11–12), and recent "[p]ublic health research has suggested not only that discriminatory environments and bans on same-sex marriage are detrimental to health but also that legalizing same-sex marriage . . . contributes to better health for LGBT people" and their children. *See* (PSOF ¶¶ 60, 62, Exs. 52–53). Because the Marriage Discrimination Laws "actually foster[] the potential for childhood destabilization" by placing children in a "legally precarious situation," those laws serve no legitimate state interest. *DeBoer*, 2014 WL 1100794, at *13 (criticizing effect on families in excluding homosexuals from marriage).

**C.   The Marriage Discrimination Laws Impermissibly Discriminate on the Basis of Sex.**

Classifications based on sex can be sustained only where the government demonstrates that they are "substantially related" to an "important governmental objective." *Virginia*, 518 U.S. 515, 533 (1996) (internal quotation marks omitted); *Gill*, 682 F.3d at 9 ("Gender-based classifications invoke intermediate scrutiny and must be substantially related to achieving an important governmental objective.").

–12–

The Arizona marriage ban constitute plain sex discrimination; the laws classify Plaintiffs based on their sex because Plaintiffs would be able to marry each other, or have their marriages recognized, if in each instance one of them were male and one of them were female. *See Kitchen*, 961 F. Supp. 2d at 1206 (holding that Utah's definition of marriage constituted sex discrimination); *Perry*, 704 F. Supp. 2d at 996 (recognizing that "[s]exual orientation discrimination can take the form of sex discrimination"); *see also Golinski v. U.S. Office of Pers. Mgmt.*, 824 F. Supp. 2d 968, 982, n.4 (N.D. Cal. 2012) (holding that DOMA restricted plaintiff's "access to federal benefits because of her sex"); *Terveer v. Billington*, No. 12-1290, 2014 WL 1280301, at *9 (D.D.C. Mar. 31, 2014) (holding that claims of sexual-orientation discrimination are sufficient to trigger the protections of Title VII's prohibitions against sex-based discrimination).

The notion that the Marriage Discrimination Laws do not impermissibly discriminate on the basis of sex because "both sexes are treated equally" is unsupportable; the anti-miscegenation law at issue in *Loving*, for example, was not saved from constitutional infirmity merely because it "appl[ied] equally" to people of all races. *See Loving*, 388 U.S. at 8 ("[w]e reject the notion that the mere 'equal application' of a statute . . . is enough to remove the classifications from the Fourteenth Amendment's proscription.").

In fact, Arizona's Marriage Discrimination Laws reflect a misguided effort to preserve traditional gender roles in society—prototypical sex discrimination that requires heightened scrutiny. *See Virginia*, 518 U.S. at 533–34; *Craig v. Boren*, 429 U.S. 190, 197 (1976). This effort is reflected in the legislative history behind the 1980 amendment to A.R.S. § 25-125. That bill left the Senate defining a "valid marriage" by the procedural licensing requirements, but, in the House Judiciary Committee, Rep. Skelly struck the original "two persons" language to add a gender component. (PSOF ¶¶ 15). The history of S.B. 1038 (codified as A.R.S. §§ 25-101 and -112) also underscores the State's gendered classifications. The record reveals extensive discussion of the traditional roles of marriage and family, with the implicit gloss of traditional gender role-modeling. (PSOF ¶¶ 35–36,

1  38, 40–41). In the Ballot Proposition Guides for Prop 102, which became Article XXX, § 1

2  of the Arizona Constitution, supporters of the Marriage Discrimination Laws relied

3  heavily on gendered distinctions of "traditional families" and "fundamental values." *See,*

4  *e.g.*, (PSOF, Ex. 58 at 7–8 (public statement of United Families Int'l in Support of Prop

5  102). In short, for unsupportable reasons, the Marriage Discrimination Laws violate the

6  Equal Protection Clause by prohibiting women from doing what men may do freely

7  (marry a woman) and men from doing what women may do freely (marry a man).

8
9  **III.    THE MARRIAGE DISCRIMINATION LAWS VIOLATE THE DUE PROCESS CLAUSE OF THE U.S. CONSTITUTION**

10         The Due Process Clause of the Fourteenth Amendment guarantees that, "[n]o

11  State shall … deprive any person of life, liberty, or property, without due process of law."

12  U.S. CONST. amend. XIV, § 1. The guarantee of Due Process protects fundamental

13  individual rights from arbitrary intrusions by the government. *See Washington v.*

14  *Glucksberg*, 521 U.S. 702, 719–20 (1997) ("The [Due Process] Clause . . . provides

15  heightened protection against government interference with certain fundamental rights

16  and liberty interests.") (citations omitted). Where, as here, the State seeks to deny an

17  individual's constitutionally-protected privacy rights, its laws are subject to strict

18  scrutiny, and the burden falls on the State to prove that the laws are "narrowly tailored to

19  serve a compelling state interest." *Id.* at 721.

20         **A.    The Marriage Discrimination Laws Affect Fundamental Rights.**

21         The Marriage Discrimination Laws affect the fundamental rights to marry and of

22  family association. As a result, the Marriage Discrimination Laws are subject to strict

23  scrutiny, and the reasons offered to justify such laws—tradition, procreation, and the

24  state's right to regulate marriage—cannot sustain them.

25                 **1.    The right to marry is a fundamental right for all.**

26         The right to marry is one of the most fundamental individual rights. *Loving*, 388

27  U.S. at 12. The Supreme Court has defined marriage as a right of liberty (*Zablocki*, 434

28  U.S. at 384), privacy (*Griswold v. Connecticut*, 381 U.S. 479, 486 (1965)), intimate choice

–14–

(*Lawrence*, 539 U.S. at 574), and association (*M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996)). In *Zablocki*, the Supreme Court explained: "Although *Loving* arose in the context of racial discrimination, prior and subsequent decisions of this Court confirm that the right to marry is of fundamental importance for all individuals." 434 U.S. at 384.

In a line of decisions dating back to 1923, the Supreme Court has consistently held that the freedom to marry is a fundamental and constitutionally protected right under the Due Process Clause. *See Hodgson v. Minnesota*, 497 U.S. 417, 435 (1990) (the decision of whom to marry is constitutionally protected); *Turner v. Safley*, 482 U.S. 78, 95–96 (1987) (prison inmates' fundamental right to marry is constitutionally protected); *Roberts v. United States Jaycees*, 468 U.S. 609, 620 (1984) (the right of intimate association limits State's "power to control the selection of one's spouse"); *Zablocki*, 434 U.S. at 384–85 ("[T]he right to marry is part of the fundamental 'right of privacy' implicit in the Fourteenth Amendment's Due Process Clause. . . . [I]t is clear that among the decisions that an individual may make without unjustified government interference are personal decisions relating to marriage . . . .") (quotation and citation omitted); *Cleveland Bd. of Educ. v. LaFleur*, 414 U.S. 632, 639–40 (1974) ("This Court has long recognized that freedom of personal choice in matters of marriage and family life is one of the liberties protected by the Due Process Clause of the Fourteenth Amendment."); *Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness. Marriage is one of the 'basic rights of man,' fundamental to our very existence and survival."); *Griswold*, 381 U.S. at 486 ("Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions."); *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923) ("Without doubt, [the Due Process Clause] denotes not merely freedom from bodily restraint but also the right of the individual . . . to marry . . . according to the dictates of his own conscience, and generally

to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men."). It is therefore unconstitutional to "deprive some couples . . . , but not other couples, of [the] rights and responsibilities [of marriage]." *Windsor*, 133 S.Ct. at 2694.

The Due Process Clause protects the fundamental rights of citizens to make personal decisions that may even be viewed as immoral or unpopular by the majority. *See Lawrence*, 539 U.S. at 577 ("[T]he fact that the governing majority in a State has traditionally viewed a particular practice as immoral is not a sufficient reason for upholding a law prohibiting the practice . . . .") (quotation and citation omitted).

### 2. Family association is a fundamental right infringed by the Marriage Discrimination Laws.

The Marriage Discrimination Laws infringe on the Plaintiffs' protected interest in autonomy over "personal decisions relating to . . . family relationships." *Lawrence*, 539 U.S. at 574; *see also Santosky v. Kramer*, 455 U.S. 745, 753 (1982) ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."); *Griswold*, 381 U.S. at 482–83 (discussing evolving concept of a protected liberty interest in intimate association); *Windsor*, 133 S.Ct. at 2689 ([M]arriage permits same-sex couples "to define themselves by their commitment to each other" and "so live with pride in themselves and their union and in a status of equality with all other married persons."). The freedom to marry the person of one's choice, regardless of gender, is necessary to preserve "the ability independently to define one's identity that is central to any concept of liberty." *Roberts,* 468 U.S. at 619.

The Marriage Discrimination Laws deprive gay and lesbian individuals of the freedom to marry the partner of their choice, bar Plaintiffs from the many legal benefits and protections afforded to different-sex families (*see generally*, PSOF ¶¶ 1, 6–9), and infringe their due process rights in the same ways that efforts to exclude others from marriage infringed on their due process rights. *See, e.g., Turner*, 482 U.S. at 94–97; *Loving*, 388 U.S. at 12.

–16–

**B.     Laws Infringing On the Fundamental Right to Marry Fail Strict Scrutiny.**

Laws that "interfere[ ] directly and substantially with the fundamental right to marriage," are subject to strict scrutiny, *Waters v. Gaston Cnty.*, 57 F.3d 422, 426 (4th Cir. 1995), and can be sustained only where the government meets its burden of establishing that the statutes are "narrowly drawn" to further a "compelling state interest[ ]." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 686 (1977). When a state seeks to limit or prohibit a fundamental right, the state must show that the limitation or prohibition is narrowly tailored to meet a compelling governmental interest. *See Glucksberg*, 521 U.S. at 721 ("[T]he Fourteenth Amendment forbids the government to infringe . . . 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.") (quotations omitted).

Arizona's Marriage Discrimination Laws fail review under strict scrutiny. Arizona's refusal to permit Plaintiffs to marry the person of their choice, or recognize their legal marriage performed in another state: (1) deprives Plaintiffs of all the rights, protections, and benefits that flow, as a matter of course, to married heterosexual couples under Arizona state and federal law; (2) deprives Plaintiffs and their families of the same dignity, respect, and stature afforded to officially-recognized opposite-sex family relationships; and (3) stigmatizes Plaintiffs, as well as their families, and subjects them to severe humiliation, emotional distress, pain, and psychological harm. (PSOF ¶¶ 1, 6–9, 60, 62).

Defendants must justify the discrimination. In striking Section 3 of DOMA, the Supreme Court rejected every justification that might be offered in support Arizona's discriminatory laws. *See Windsor*, 133 S.Ct. at 2696 ("The federal statute is invalid, for no legitimate purpose overcomes the purpose and effect to disparage and to injure[.]"). The Court reaffirmed the liberty of individuals to form intimate relationships without being demeaned or degraded by their government. *Id.* at 2694.

–17–

1   The denigration endured by legally married same-sex couples referred to in
2   *Windsor* is the same suffered by those Arizona same-sex couples who seek to be married
3   or seek to have their marriages recognized in Arizona. *See* § II.A, *supra*. The unequal
4   treatment, discrimination, and humiliation that gay and lesbian individuals suffer in
5   Arizona violates the fundamental right to marry a person of one's choice and is not
6   narrowly tailored to meet any conceivable compelling state interest.

7   **C.   The Fundamental Right to Marry Cannot Be Infringed Based On**
8   **History and Tradition.**

9   As discussed in § II.3.A, *supra*, tradition and history do not justify the denial of
10  fundamental rights. *See Williams v. Illinois*, 399 U.S. 235, 239 (1970) ("[N]either the
11  antiquity of a practice nor the fact of steadfast legislative and judicial adherence to it
12  through the centuries insulates it from constitutional attack."); *Walz v. Tax Comm'n of*
13  *New York*, 397 U.S. 664, 678 (1970) ("It is obviously correct that no one acquires a vested
14  or protected right in violation of the Constitution by long use, even when that span of
15  time covers our entire national existence and indeed predates it."). In fact, tradition
16  favors the freedom of the individual to decide whom to marry. *See Lawrence*, 539 U.S. at
17  574 ("[O]ur laws and tradition afford constitutional protection to personal decisions
18  relating to marriage . . . .") (citation omitted).

19  For decades, supporters cited history and tradition in support of the bans on
20  interracial marriage throughout the United States:

21          [T]he fact that the governing majority in a State has
22          traditionally viewed a particular practice as immoral is not a
            sufficient reason for upholding a law prohibiting the practice;
23          neither history nor tradition could save a law prohibiting
            miscegenation from constitutional attack. Second, individual
24          decisions by married persons, concerning the intimacies of
            their physical relationship, even when not intended to
25          produce offspring, are a form of 'liberty' protected by the
            Due Process Clause of the Fourteenth Amendment.
26          Moreover, this protection extends to intimate choices by
            unmarried as well as married persons.
27

28  *Bowers v. Hardwick*, 478 U.S. 186, 216 (1986) (Stevens, J., dissenting) *cited with approval in*

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*

1  *Lawrence*, 539 U.S. at 577–78. In short, reference to history or tradition does justify the

2  discriminatory effect of the Marriage Discrimination Laws.

3       **D.**    <u>**The Fundamental Right to Marry is Not Limited to Couples Who Can**</u>

4  <u>**Procreate.**</u>

5         The fundamental right to marry is not limited to couples who can procreate, which

6  Defendants may argue. As noted earlier, the Supreme Court has never defined the right

7  to marry in terms of a couple's ability or desire to procreate or raise children. Rather, the

8  Supreme Court has expressly recognized that the right to marry extends to individuals

9  unable to procreate with their spouse, *see Turner*, 482 U.S. at 95, and that married couples

10  in fact have a fundamental right not to procreate. *See Griswold*, 381 U.S. at 485. Even

11  incarcerated prisoners, having no right to conjugal visits, nevertheless retain their

12  fundamental right to marry because "[m]any important attributes of marriage remain . . .

13  after taking into account the limitations imposed by prison life . . . [including the]

14  expressions of emotional support and public commitment," the "exercise of religious

15  faith," and the "expression of personal dedication," which "are an important and

16  significant aspect of the marital relationship." *Turner*, 482 U.S. at 95–96.[9]

17         Many gay and lesbian couples, including some Plaintiffs, procreate, adopt, and

18  foster children. (PSOF ¶¶ 1, 12). These couples testify to the profound love that they give

19  and receive in return as parents:

20                [W]e received a call about the placement of another child

21                named Ricky, who we fell in love with from day one. He
              became the love of our lives.

22  (PSOF, Ex. 7, ¶ 23) (Decl. Plf. R. Mason Hite, IV). The interests of these families would

23  best be served by *legalizing* same-sex marriage. As a result, they would receive the

24

25         [9]   The existence of a legal right to have sexual relations with another person of the

26  same sex does not end the inquiry into the right of same-sex couples to marry. *See
Lawrence*, 539 U.S. at 567 (to say "'marriage is simply about the right to have sexual

27  intercourse'" would "demean a married couple"). Any suggestion otherwise would run
contrary to the well-established principle that the Constitution "define[s] the liberty of

28  all," and is not merely a tool to "mandate … [a] moral code." *Id.* at 571. (citation
omitted).

–19–

financial, social, and legal benefits of marriage. *See generally*, (PSOF ¶¶ 57–62). Federal statistics show that "four of the ten lowest divorce rates in the county came from states with marriage equality." (PSOF ¶ 56). And, children raised in same-sex households fare just as well as those raised by different-sex parents. Finally, removing the stigma attached to same-sex couples who cannot marry would benefit their children. (PSOF ¶¶ 57–62).

**E.      The Fundamental Right to Marry Cannot be Denied to Same-Sex Couples Even Though the Regulation of Marriage is Generally Left to the States.**

Even though marriage is a matter generally left to the states, *see Ex Parte Burrus*, 136 U.S. 586, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States."), state restrictions imposed on marriage must nevertheless comply with the Constitution. *See Loving*, 388 U.S. at 12 (state statute limiting marriage to same-race couples violated equal protection and due process laws). Federal courts have routinely struck down state laws dealing with family law and domestic relations when those state laws violate the Constitution. *See, e.g., Roberts*, 468 U.S. at 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse[.]").

Several cases illustrate the point: *Zablocki*, 434 U.S. at 376–77 (striking down state statute restricting from marriage persons owing child support as a violation of the Equal Protection Clause); *Turner*, 482 U.S. at 99 (striking down state law prohibiting marriage by prison inmate without the approval of the warden); *Stanley v Illinois*, 405 U.S. 645 (1972) (state law denying an unmarried father a hearing on his fitness as a parent before his children are removed from his custody violates Equal Protection Clause); *Moore v. City of East Cleveland*, 431 U.S. 494 (1977) (striking down city zoning law that prohibited grandmother from sharing a home with her grandsons who were cousins with each other rather than siblings); *Orr v. Orr*, 440 U.S. 268 (1979) (striking down state law providing alimony for dependent wives, but not for dependent husbands); *Caban v. Mohammed*, 441 U.S. 380 (1979) (state law permitting unwed mothers, but not unwed fathers, to block the

−20−

adoption of a child by withholding consent violates the Equal Protection Clause).

In *Lawrence*, the Court made clear that the liberty interests protected by the Due Process Clause, including the right to make decisions relating to marriage, applies equally to gays, lesbians, and heterosexuals.

> The *Casey* decision again confirmed that our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relations, child rearing, and education. . . . In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:
>
> These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.
>
> Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.

*Lawrence*, 539 U.S. at 573–74 (quotations omitted).

Finally, federally recognized fundamental rights may not be infringed by public vote. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) ("The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials, and to establish them as legal principles to be applied by the courts. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; they depend on the outcome of no elections."). Although states may regulate marriage, they do so within the confines of the U.S. Constitution and may not restrict the right to marry in a way that interferes with an individual's constitutionally protected, fundamental rights. *Id*.[10]

---

[10]   Alternatively, if the Court is inclined to find that no fundamental right to marriage exists for same-sex couples, Plaintiffs urge that the Court treat them instead as members of a quasi-suspect class defined by sexual orientation, as described in *Witt*, 527 F.3d at 818, and then review their due process claim using the heightened scrutiny standard that

**IV.    THE COURT SHOULD PERMANENTLY ENJOIN ENFORCEMENT OF THE MARRIAGE DISCRIMINATION LAWS TO PROHIBIT FURTHER CONSTITUTIONAL HARM.**

Following declaratory relief, Plaintiffs respectfully request the Court's permanent order enjoining enforcement of the Marriage Discrimination Laws.[11] In order to justify a permanent injunction, Plaintiffs must demonstrate: (1) irreparable injury; (2) inadequacy of remedies available at law; (3) balance of hardships favoring an equitable remedy; and, (4) no disservice to the public interest. *See, e.g.*, *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

*Irreparable Injury and Inadequate Remedies.* The loss of a constitutional right "even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion); *see also, U.S. v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (same). Here, without the Court's declaratory relief and permanent injunction, the Plaintiffs and their families will suffer the disrespect, stigma, and uncertainty that flows from the loss of their right to choose their marital partner, together with the daily burdens they and their families have suffered for years, including, taken together, the loss of benefits and rights described in over 1,150 state laws solely because Plaintiffs cannot be legally married in Arizona. (PSOF ¶¶ 1, 6–9) (*Compendium of Laws Affecting Marriage*). Only an injunction remedies these ongoing constitutional violations.

*Witt* mandates, a standard that parallels the heightened scrutiny standard identified in *SmithKline*. For purposes of that analysis, Plaintiffs direct the Court to their heightened scrutiny discussion set forth above under the Equal Protection argument, and urge a similar conclusion–that the Marriage Discrimination Laws cannot sustain heightened scrutiny under the Due Process Clause and must be nullified.

[11] Plaintiffs married outside Arizona have been denied the protections of the Due Process Clause. The remedy for these married plaintiffs is the same as the remedy for unmarried plaintiffs—striking A.R.S. § 25-101(C)(because the anti-recognition statute (A.R.S. § 25-112) incorporates A.R.S. § 25-101(C) by reference). If, in other words, the Court strikes subsection 25-101(C), then no state official has any basis for refusing to recognize the marriage of those who have been legally married elsewhere. "These guideposts are at the bottom of the 'elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected.'" *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985) (quoting *Allen v. La.*, 103 U.S. 80, 83–84 (1881), *quoted with approval in Field v. Clark*, 143 U.S. 649, 695–96 (1892)).

–22–

1       *Balance of Hardships*. The balance of hardships tips clearly in favor of Plaintiffs.

2   The record confirms that the Marriage Discrimination Laws harm these plaintiffs and

3   their children in many ways; but the defendant clerks, who would simply issue more

4   marriage licenses if the requested injunction issued, would suffer no harm. *E.g.*, *DeLeon*,

5   2014 715741, at *25–26 (finding that injury to plaintiff outweighed damage to State of

6   Texas from enjoining enforcement of same-sex marriage ban and anti-recognition law).

7       *The Public Interest*. Finally, the public interest would be served by enjoining

8   enforcement of the Marriage Discrimination Laws. Recognition of Plaintiffs' marriages

9   and, in other cases, allowing them to marry their partner would, for example, stabilize

10   these same-sex families and diminish the harm caused by the Marriage Discrimination

11   Laws. (PSOF ¶¶ 1, 60–62). On the other hand, allowing same-sex marriage causes no

12   effect on either the marriages of or the benefits that flow to different-sex couples. Some

13   evidence indicates that the institutions of marriage and family have improved in states

14   that allow same-sex marriage. (PSOF ¶¶ 55–56). The record, in short, supports entry of a

15   permanent injunction.

16   **CONCLUSION AND REQUEST FOR RELIEF**

17       Each plaintiff shares the hope expressed by plaintiff Natalie Metz, who married her

18   partner, Meagan, in the State of Washington:

19           Meagan and I were engaged on the ferryboat to Bainbridge

20           Island and that is where we returned to make our
commitment . . . . To be able to walk into the county clerk's
office and . . . be treated like any other couple was one of the

21           best days of my life! I am hopeful to be able to receive this
same treatment and acceptance in the State of Arizona where

22           I have lived for 27 years.

23   (PSOF, Ex. 10, ¶ 6) (Decl. Plf. Natalie Metz). But, instead of expressing acceptance,

24   Arizona's laws confirm that gay men and lesbians are different, their loving and

25   committed relationships are ineligible for marriage, and they and the children they raise

26   are unworthy of that 'most important relation in life.' No less than the provision of

27   DOMA invalidated in *Windsor*, Arizona's prohibition of same-sex marriage "demeans"

28   same-sex couples, "places [them] in an unstable position," "humiliates" the "children

now being raised by same-sex couples," and "instructs all [State] officials, and indeed all persons with whom same-sex couples interact, including their own children, that their [relationship] is less worthy than the [relationships] of others." 133 S.Ct. at 2694–96.

Plaintiffs therefore respectfully request the Court's order (a) permanently enjoining the Defendants, acting in their official capacities, and all others under their supervision and control, and those acting in concert with them, from enforcing Article 30, § 1 of the Arizona Constitution and A.R.S. §§ 25-101(C) and 25-125(A); and, (b) compelling Defendants to accept the application of, issue marriage licenses to, and record the returned marriage licenses from the unmarried plaintiffs.

DATED: April 21, 2014.

By *s/ Shawn K. Aiken – 009002*
Shawn K. Aiken
Heather A. Macre
William H. Knight
Stephanie McCoy Loquvam
2390 East Camelback Road, Suite 400
Phoenix, Arizona 85016

By *s/ Ryan J. Stevens – 026378*
Ryan J. Stevens
GRIFFEN & STEVENS LAW FIRM, PLLC
609 North Humphreys Street
Flagstaff, Arizona 86001

By *s/ Mikkel Steen Jordahl -- 012211*
Mikkel Steen Jordahl
MIKKEL (MIK) JORDAHL PC
114 North San Francisco, Suite 206
Flagstaff, Arizona 86001

By *s/ Mark Dillon -- 014393*
Mark Dillon
DILLON LAW OFFICE
PO Box 97517
Phoenix, Arizona 85060

By *s/ Herb Ely -- 000988*
Herb Ely
3200 North Central Avenue
Suite 1930
Phoenix, Arizona 85012

Attorneys for Plaintiffs

–24–

1
2

I hereby certify that on this 21st day of April, 2014, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and a copy was electronically transmitted to the following:

3
4
5
6
7
8
9

| | |
|---|---|
| Kathleen P. Sweeney | Jonathan Caleb Dalton |
| Todd M. Allison | Byron J. Babione |
| Assistant Attorneys General | Special Assistant Attorneys General |
| 1275 West Washington | Alliance Defending Freedom |
| Phoenix, Arizona 85007-2997 | 15100 North 90th Street |
| kathleen.sweeney@azag.gov | Scottsdale, Arizona 85260 |
| todd.allison@azag.gov | CDalton@alliancedefendingfreedom.org |
| Attorneys for Defendants | BBabione@alliancedefendingfreedom.org |
| | Attorneys for Defendants |

10
11

*s/ DeAnn M. Buchmeier*

12

S:\Connolly - Pochert\21401001\Pleadings\MSJ-MOL 140421.docx

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Connolly et al. v. Roche et al.*
*Plaintiffs' Motion for Summary Judgment – Memorandum of Law*